## DANIEL FRANCIS PRENDIVILLE, Appellant, v. ADELE PRENDIVILLE et al.

Division Two, July 16, 1920.

1. **ESTOPPEL: Sitting Aside Deed: Agreement Not to Sue: Friendly Partition.** Where at the time plaintiff and two of his sisters agreed to a friendly partition of the real estate left them by their father he knew that his deceased mother had conveyed to one of them certain property owned by her as the survivor of an estate by the entirety, and he asked and received the most valuable third of the property partitioned upon his express promise and understanding that he would forego his right to bring suit to set aside the mother's deed, which he was threatening to do on the ground

Prendiville v. Prendiville.

that it was obtained by the undue influence of the sisters over the mother at a time when she was incapacitated to make a valid deed, he is by his conduct estopped to attack the mother's deed.

2. ——: Statute of Frauds: Full Performance of Agreement. Whether or not an oral agreement between a brother and sisters that if they would convey to him their interest in certain lands inherited from their father he would not contest the validity of a deed by which their mother had conveyed her property to the sisters was one falling within the Statute of Frauds, equity will refuse to aid him in breaching it where it is fully performed, the consideration has passed and the sisters are in possession. One who sells an equitable interest in land, receives the consideration, and yields possession, will not be permitted to say afterwards that the agreement was not in writing.

3. ——: ——: Equity. The main object sought to be accomplished by the Statute of Frauds is the prevention of frauds; and one of the wholesome uses of equitable estoppel is to prevent the statute from being used as a fortification behind which fraud may be successfully perpetrated, and in so using it supplementary force and energy are given to the statute.

Appeal from St. Louis City Circuit Court.—*Hon Thomas C. Hennings,* Judge.

AFFIRMED.

*Walter B. Douglas* and *Alfred J. Strobans* for appellant.

(1) It being shown by the evidence that the defendant to whom the deed sought to be set aside was made was the manager of her mother's property and occupied a fiduciary relation with her mother, the burden was on the defendants "to show that absolute fairness, adequacy and equity characterized the transaction." 2 Pomeroy, Equity, secs. 955, 956; Kincer v. Kincer, 246 Mo. 427; Byrne v. Byrne, 250 Mo. 632; Martin v. Baker, 135 Mo. 495; Street v. Goss, 62 Mo. 228; Mowry v. Norman, 204 Mo. 175; Bradford v. Blossom, 207 Mo. 230. The deed being prepared by the direction of the managing defendant, being without consideration and being an

unnatural disposition of the property, and being kept secret from the son, makes it imperative that fairness be shown. Meier v. Buchter, 197 Mo. 68; Dausman v. Rankin, 189 Mo. 707; Gibson v. Hammang, 63 Neb. 349; Huffman v. Huffman, 217 Mo. 235; Gay v. Gillilan, 92 Mo. 264. The alleged grantor had no independent advice; the matter being wholly in the hands of the managing defendant and her employee. 1 Bigelow on Fraud, 262; Armstrong v. Logan, 115 Mo. 465. (2) The court erred in holding that the plaintiff was estopped from questioning the validity of the deed. There was not sufficient plea of estoppel. Bliss on Code Pleading, sec. 364; Central Nat. Bk. v. Doran, 109 Mo. 81. There was no sufficient evidence in support of an estoppel. Taylor v. Williams, 45 Mo. 80; Wendover v. Baker, 121 Mo. 294; Kirk v. Middlebrook, 201 Mo. 245; Sitton v. Shipp, 65 Mo. 297; Railroad v. McCarty, 97 Mo. 214; McKee v. Higbee, 180 Mo. 299; Merrill v. Thompson, 252 Mo. 730; Hersman v. Hersman, 253 Mo. 86; Russell v. Sharp, 192 Mo. 287; 2 Pomeroy's Eq. sec. 808; Norris v. Letchworth, 140 Mo. App. 19. (3) The alleged oral agreement of plaintiff to waive his claim as heir to one-fourth of the real property conveyed by the deed procured by defendant Adele Prendiville, not being evidenced by a memorandum signed by plaintiff as required by statute, is void. R. S. 1909, sec. 2783; Harris Appeal, 3 Walker (Pa.) 24; Tapley v. Ogle, 162 Mo. 190; Wendover v. Baker, 121 Mo. 273; Hackett v. Watts, 138 Mo. 302; De Bardelaben v. Standemire, 82 Ala. 574. And a contract within the Statute of Frauds cannot be made the basis of estoppel. Smith v. Smith, 62 Mo. App. 596; Sursa v. Cash, 171, Mo. App. 396.

*Muench, Walther & Muench* for respondents.

(1) The deed here assailed expresses the intention of the grantor, formed many years before. The disposition thereby made is inherently natural, just and fair. While made to defendant Adele alone, she took

title merely in trust to execute the intentions of the do-
nor, and those intentions were faithfully and promptly
carried out.  Hence the ordinary rules with respect to
conveyances to fiduciaries are inapplicable.  Huffman
v. Huffman, 217 Mo. 194; Hanfield v. Hennegar, 259 Mo.
50; Bennett v. Ward, 199 S. W. 947.  (2)  The trans-
action having resulted in the precise manner intended
by the grantor in the deed, there is no ground for inter-
ference by the courts.  Especially when no undue influ-
ence whatever is shown by the evidence, and the proof
shows the grantor to have fully understood the trans-
action.  Huffman v. Huffman, 217 Mo. 192.  (3)  The
plea of estoppel by defendants was adequate, and set
forth the substantial and ultimate facts out of which it
grew.  If plaintiff felt that the plea was too indefinite,
a motion to make more definite would have reached the
point.  Absent this, he is bound by the result.  Olden
v. Hendrick, 100 Mo. 540; Bigelow on Estoppel, pp. 775
*et seq.*  (4)  (a)  The plea is not in the nature of a cross-
bill to specifically enforce an oral contract, as plaintiff
seems still to imagine. It is a plain plea of "estoppel *in
pais,*" or equitable estoppel, and as such needs no sup-
port in writing.  16 Cyc. 757; 1 Story, Eq. Jur. secs. 385,
387; Taylor v. Zepp, 14 Mo. 345; Chouteau v. Goddin, 39
Mo. 250; Coke on Litt., 356; Doe d. Morris v. Rosser, 3
East, 15; Guffey v. O'Reiley, 88 Mo., 418; Hart v. Giles,
67 Mo. 175; Rice v. Bunce, 49 Mo. 231; Palmer v. Welch,
171 Mo. App. 580; Boeckler Co. v. Wahlbrink, 191 Mo.
App. 335.  (b)  The evidence is ample, and overwhelm-
ing, to establish the estoppel pleaded.  Plaintiff's bare
denial of the facts supporting the plea is met by the
positive evidence of two witnesses who have no material
interest in the result of the case, as well as by convin-
cing circumstances.  The trial court had the best oppor-
tunity to observe these witnesses, and its finding of fact
should be largely deferred to.  Hummell v. Zinn, 184 S.
W. 1154; Yaeger v. Yaegar, 185 S. W. 743; Thurmond
v. Thurmond, 186 S. W. 1; Thiesen v. Thiesen, 167 Mo.

App. 264; Griesedieck v. Griesdieck, 56 Mo. App. 98; Schierstein v. Schierstein, 68 Mo. App. 205; Wald v. Wald, 199 Mo. App. 347; Hull v. Hull, 168 Mo. App. 220; Creamer v. Bivert, 214 Mo. 479; Huffman v. Huffman, 217 Mo. 182; Daman v. Remme's Exr., 246 Mo. 240; Halsey v. Thrailkill, 237 Mo. 721; Walther v. Null, 233 Mo. 134.

WILLIAMS, P. J.—This is a suit in equity instituted by plaintiff against his three sisters, to set aside a deed made by their mother to the defendant, Adele Prendiville.

In the petition plaintiff alleges that the deed was the result of undue influence, and that at the time the deed was executed the grantor therein did not have sufficient mental capacity to comprehend the nature of her act. The answers deny that the deed was the result of undue influence or that the grantor therein was without sufficient mental capacity to make the deed, and then sets up a plea of estoppel, which in substance alleges that the plaintiff and two of the defendants owned as tenants in common the remaining interests in certain land left by their father, subject to a life estate in their mother; that after their mother's death the plaintiff and two of the defendants agreed to a partition of the said real estate; that plaintiff was given the more valuable portion of said real estate and on that act promised that he would not institute a suit against the defendants to set aside the deed which is now in question.

The trial court found the issues in favor of the defendants on the theory that the plaintiff had become estopped by his conduct. Plaintiff thereupon duly perfected an appeal to this court.

There appears to be but little dispute between the two statements of facts found in the briefs. The statement found in respondent's brief is more concise and for that reason we quote largely from the statement of facts made by respondents as follows:

"Undisputed facts are that prior to his death (March 3, 1905), Maurice Prendiville, father of these litigants, had made disposition of his estate so that he and his wife, Bridget Prendiville, retained joint life-estates in one tract of land on Bacon Street, containing a front of 110 feet, and improved by two double houses and one single building, and another tract of 75 feet front on St. Ferdinand Avenue, improved by a row of four houses with flats above and below, while title by the entirety to the old family homestead on Prairie Avenue, also occupying a front of 75 feet, was vested in himself and wife.

"That, when his father died, plaintiff, Frank Prendiville, was a member of the household, and so remained for a period of two or three years thereafter; that he scarcely spoke to his mother while such member of the family—she having refused to pay him $2,000 out of her life insurance—and that after his marriage, and for a period of almost eight years, he never again saw his mother. That, after the burial of the mother, Frank rode back to her late home with his two sisters, Martha and Adele, and then and there began negotiations for the division of the Bacon Street and St. Ferdinand Avenue property, which negotiations ended with the exchange of deeds about November 24, 1915.

"It likewise appears without contradiction that some years after the death of Maurice Prendiville, his widow removed the old homestead building on Prairie Avenue, and being then the owner in fee of the land, as survivor, erected thereon another row of small tenements of three rooms each, being numbered from 2419 to 2425a North Prairie Avenue, and that, on the day when Mrs. Prendiville suffered a stroke of paralysis, Dr. Klein, after seeing the patient, advised that the daughters have any disposition she desired to make attended to without delay, and her daughter, defendant Adele, thereupon went to the office of the North St. Louis Savings Trust Company and there consulted with two parties connected with that institution concerning the execution of deeds

whereby the Prairie Avenue property should be con·
veyed to her three daughters, in the proportion of two
houses to Mrs. Morley, and one each to Martha and
Adele; that, upon being informed that such division was
impracticable without a survey defining the division line,
the notary, Moresi, was then directed by her to make one
deed, conveying all the property to her, she thereafter to
make the division; that the notary drew such a deed, and
that afternoon took it to Mrs. Pendiville's residence for
signature, where her mark was affixed and the acknowl-
edgment taken, in the presence of the notary, defend-
ant Adele, defendant Martha and Mr. Daniel Murphy,
the latter two of whom signed the deed as witnesses.

"As to matters not admitted, or as to which the
evidence conflicts, the following appears:

"To sustain his charges of undue influence and
mental incapacity, plaintiff merely adduced evidence
showing that after the death of Maurice Prendiville, de-
fendant Adele attended to looking after the renting of her
mother's property, the collection of her rents and pay-
ment of bills. . . . As to the question of mental
capacity, plaintiff adduced the evidence of one Dr. Klein,
who had treated Mrs. Prendiville, at long intervals,
during many years preceding. He was called in the
morning the paralysis occurred, and expressed the opin-
ion that the attack was caused by the bursting of a small
artery in the brain consequent upon arterio sclerosis.
He did not speak to the patient; she attempted to speak
to him, but he could not understand her; he is not certain
that she was comatose at the time; he has forgotten
whether she could take medicine, he wasn't there long
enough. The witness also disclaimed being an expert.
He is 'pretty sure' Mrs. Prendiville did not regain con-
sciousness after she became unconscious. 'I believe, I
am not sure, but I think, she was unconscious. It has
been so long ago, and I never expected to hear anything
more of it.' He is equally uncertain in his other state-
ments, and locates the patient's paralysis as being on the

right side, when the uniform testimony, otherwise, is that she was paralyzed on the left side. He added that you can't tell the effect of arterio sclerosis on the human mind. 'Sometimes they are all right.' On cross-examination, he stated that one of the effects of arterio sclerosis in very old people was to cause occasional aberrations, or aged childishness, when between times, for weeks and weeks less the person might be perfectly normal. He also stated that when first called he advised the daughters to have some one called in to make the old lady's will. Partial paralysis in persons of temper, naturally makes them feel ill-tempered. On re-direct examination, Dr. Klein was asked, and answered as follows:

" 'Q. In your judgment, was your patient in a condition in which she was able to make a will? A. I don't know, I couldn't answer that question; I don't really know.'

"Later on Dr. Klein was recalled to give certain dates from his memorandum book and was again asked by plaintiff's counsel:

" 'Q. Now, doctor, from what you knew of Mrs. Prendiville, and what you saw on that date, was she, in your judgment, in a fit condition to transact any business? A. Well, now, I don't know; I think not, though.'

"Plaintiff also called Louis J. Moresi, the scrivener and notary who wrote the deed and took the acknowledgment thereto, and his testimony with reference to this transaction was that he is manager of the real estate department of the North St. Louis Savings Trust Company; that on September 23, 1915, he found Miss Adele Prendwille in the office when he reached it, talking to another man employed there. She wanted a deed drawn for the Prairie Avenue property so as to divide it amongst the several sisters. Witness told her that since the houses were attached, a proper description could not be made up without a survey. Then she said he had better draw the deed to her, and she would take

care of the sisters afterwards. She also asked about
the necessity for witnesses to the deed, and made some
mention of a will. Witness told her that if the mother
signed by a mark, two witnesses would be required,
but was not certain whether her sister could officiate as
one of them. Witness was to call in the afternoon with
the deed, to get the acknowledgment, the mother being
ill at the house. He went there some time between three
and five o'clock, and found the witness Murphy present.
The party went up stairs into the room where the mother
was, and witness Moresi there 'read her the entire deed,
or explained it to her, or read the description.' He made
it a point to go over the description and to tell Mrs.
Prendiville just—(interrupted) and she signified she
knew what the description was. He does not remember
any interruption or suggestion by anyone else. He was
introduced to the grantor, but had known Mr. Murphy
and Miss Prendiville before. Murphy made a remark or
two to Mrs. Prendiville as he came into the room.
Witness continued: 'It occurred to me there that I
should ask it over, and then it occurred to me: don't be
too scrupulous on that point, because she had acknowl-
edged it before I finished.'

" 'She held the pen and made as much of a mark
as she could by herself;' don't remember who gave her
the pen, whether she picked it up or not. She was
propped up in bed, held the pen in her right hand, and
made the mark with her own effort as much as she could .
'I remember I was trying to let her make it with her own
hand without any assistance.' Witness held the book or
table she wrote on, and assisted her; and she made the
cross on the deed. It was after she signed the deed that
the acknowledgment was asked for. 'I remember she
acknowledged, on account of what I said before.' He
put his seal upon the paper, but does not remember
whether he placed it on the table or handed it to the
'girls,' or what he did with it.

"On cross-examination witness stated that he never
had anything to make him feel that Mrs. Prendiville did

not know what she was doing, or could not recognize what she was doing.

"There was no other evidence adduced by plaintiff relating to the execution of the deed or the sanity of the grantor."

"Bearing upon these issues, the testimony for the defendants was:

"Daniel Murphy, a night watchman, aged 76, who had known Mrs. Bridget Prendiville for about sixty years, was present at the execution of the deed, and signed the same as a witness. Besides the witness, the notary Moresi and the two unmarried daughters were present. He had been asked to sign as a witness to a deed or deeds, and came for that purpose. They all went upstairs into the old lady's room; she at first seemed 'kind of dazed,' but the daughters said: 'This is Mr. Murphy, mother,' and she said 'Oh, yes,' and she put out her right hand, which he shook, and said: 'Mrs. Prendiville, I am very sorry to see you so low.' That was all his conversation. Mr. Moresi was there with the deed, some one lifted her up, Moresi held the deed in front of her, and read out of it, but witness cannot now say what he did read. She said: 'Yes, yes.' He assisted her, took her hand, and she made that cross, and witness afterwards also signed. Moresi asked her some questions, but witness has forgotten what they were. To the best of witness's impression, the notary asked her if she understood what she was doing.

"Both the unmarried daughters, Martha and Adele, were by the court permitted to testify that they saw their mother place her mark to the deed, but all other evidence by them regarding the transaction was excluded on objection of plaintiff. Specific offers were made to prove by all three daughters, that Mrs. Prendiville had many times declared her intention of giving Mrs. Morley two of her houses on Prairie Avenue, and one each to her other two daughters, so as to rectify an inequality which occurred when Mr. and Mrs. Prendiville

divided their other property among their children to the exclusion of Mrs. Morley and that, in causing the deed in question to be prepared by Mr. Moresi, defendant Adele obeyed the expressed wishes of her mother. All this testimony was excluded by the trial court under its construction of Section 6354, Revised Statutes 1909; but defendants' witness, Miss Mary Gallagher, testified that she had known Mrs. Prendiville for some twenty-five years, came to work for her when she was a child of eleven years, remained with her some seven years, and thereafter called upon her as often as once or twice a month. She saw her the day after the paralysis, shook hands and conversed with her quite a while. Mrs. Prendiville mentioning that Mr. Murphy had been to see her the day before. She also told her about being paralyzed, that Dr. Klein had told her it would be some six weeks before she could use her hand again; she also asked how the brother-in-law of witness was, who likewise suffered paralysis of the left hand. She spoke as she always did, in her usual way, not different from former times. Witness saw Mrs. Prendiville again on Saturday, Sunday and Monday. She was very 'nice' on Saturday, and at the close of the visit asked her daughter, Martha, to play one of the new pieces on the Victrola for witness. The Sunday visit lasted all afternoon. Witness had no difficulty whatever in understanding Mrs. Prendiville, and the state of her mind was still very nice. On Monday evening she was greatly changed, speechless, unconscious and sinking. That was the first noticeable change in her condition.

"About one and a half or two years before, Mrs. Prendiville talked to witness regarding her intended disposition of her Prairie Avenue property. 'Well, she told me she was going to give Mary two of these houses, she said, because her father didn't leave her anything; on account of those children she would give Mary two of the houses. She had often said it before, but that is the last time I remember of her saying it.'

"At the time referred to Mary Morley had seven children.

"From her intimate knowledge of Mrs. Prendiville, this witness also stated that the deceased was a woman of very strong willpower.

"Relative to the issue of estoppel, the following testimony was also adduced:

"Defendant Adele Prendiville testified that on their return from the mother's funeral, Frank Prendiville demanded to see the rent books, and spoke of dividing the property of Bacon Street and St. Ferdinand Avenue, and when he charged his sister with stealing the rents, she refused to speak to him further until she could consult an attorney. She did so, and during the next interview, on next Sunday evening, he was informed about the deed in question, and he threatened to set it aside. He frequently renewed these threats, and witness retorted that she would fight the case if he attempted to carry them out. Frank kept coming back every few days for nearly six weeks, making various demands for a division of the rows on Bacon Street, and St. Ferdinand Avenue, respectively. At first he wanted all four houses on St. Ferdinand, which Adele and Martha refused to consider; then he suggested a division of two houses on Bacon and one on St. Ferdinand, and when the sisters agreed to that, he again changed his mind, because he did not want a half interest in a double house, and did not want No. 1907 Bacon Street because it had not yet been changed into flats. He then modified his demands to three houses on Bacon Street, naming No. 1913, a single building, and Nos. 1909 and 1911, a double building. Then the sisters said, if he would leave the deed to the **Prairie** Avenue row stand, they would give him what he demanded. The court excluded testimony as to whether witness Adele would have consented to give Frank three houses on Bacon Street but for his promise to let the Prairie Avenue deed stand.

"Defendant Martha Prendiville testified, as to the foregoing negotiations, that, according to her recollection, Adele told Frank about the deed in question on the very first visit of the latter, when they returned from the mother's funeral, and he at once said that he was going to set it aside. She also related the different propositions made by Frank regarding the division of the property on Bacon Street and St. Ferdinand Avenue. He finally said: 'You give me three houses on Bacon Street and I will not set the deed to the Prairie Avenue row aside, and I will allow Mrs. Morley to have two houses,' and thereafter she and Adele agreed to give him the three houses so he would not set aside the Prairie Avenue deed; witness knew the Bacon Street houses were worth more than on St. Ferdinand Avenue. All the deeds were drawn, executed and delivered, as well as those dividing the two properties on Bacon Street and St. Ferdinand between Frank, Adele and Martha, as those dividing the Prairie Avenue row between the three sisters, as contemplated. They are all dated November 24, and were acknowledged and recorded within a week thereafter.

"On the other hand appellant testified that he first heard of the deed in question, 'Oh, some time in the middle of November, . . . after we had a settlement of our estate,' and then through Mrs. Morley. That nothing whatever was said about the Prairie Avenue houses during the negotiations with his sisters, but on re-examination admits that during his negotiations with his sisters, on Sunday afternoon, Adele jumped up excitedly and said she would give $100 'if I would have that deed set aside,'" and he admits that as manager of the real estate department of the West St. Louis Trust Company it was his duty to, and he did, watch real estate transfers reported in the 'St. Louis Daily Record,' from day to day.

"The deed in question was recorded October 15, 1915.

"As to the relative value of the two properties thus divided, the proof shows that the St. Ferdinand Avenue row occupies ground fronting 75 feet on that street, while the houses on Bacon Street occupy a front of 110 feet, the depth in each instance being 120 feet.

"The row on St. Ferdinand consists of four houses under one roof, comprising eight small tenements of three rooms each, without baths or running water. Three of these were vacant at that time, and one had been idle for over a year. The tract on Bacon Street consisted of two double houses and one single house (No. 1913), separated by adequate walks or gangways for the benefit of tenants. In 1915, the single house (No. 1913), the double house (Nos. 1909 and 1911), and the southern half of the remaining house (No. 1905), had been converted into upstairs and downstairs flats, with bath rooms and like equipments, while No. 1907 was still being rented in its original state. Each change into flats had cost about $600, and the rentals were augmented accordingly. The flats yielded a rental of $14.50 below and $15 above, per month, while the unchanged house No. 1907 yielded only $24, as a whole.

"The tenements on St. Ferdinand, when rented, brought $12 and $12.50 per month, to-wit, $24.50 per house, at this time.

"No. 1913 Bacon Street had been vacant for about a year, and some plumbing taken away by boys who broke in. No. 1905 had been vacant about as long, and its wall paper was off. Nos. 1909 and 1911 were in good condition, and only one tenement vacant.

"According to defendants' testimony, the Bacon Street neighborhood is the nicer of the two and easier rented.

"Plaintiff Frank Prendiville's own testimony is that he 'thinks' the flats on St. Ferdinand Avenue rented for $12.50 per month, while those on Bacon Street yielded $14, or $14.50, when rented, and one (No. 1909), yielded $15 per flat.

"By the deal, Frank secured a total front of 65 feet on Bacon Street with common use of gangway between his and his sister's houses. It cost him $341 to put No. 1913 in proper shape after he acquired it. He estimated each of the four houses on Bacon Street at $2,500 and the single house (No. 1913) at $2,750, while the four houses on St. Ferdinand Avenue are valued by him at $2,100 each.

"Taking the estimates thus given by plaintiff himself, the three houses secured by him were worth $7,750, from which may perhaps he deducted the $341 alleged to have been spent for repairs on No. 1913, making the net value $7,409, while the one house on Bacon Street and the houses on St. Ferdinand Avenue given each sister, were worth, respectively, $6,700, not reckoning the repairs which No. 1905 required. In other words, there was an actual difference in money value, according to his own testimony, of from $709 to $1,050 in each instance."

The trial court decided this case on the theory that plaintiff had by his conduct become estopped to now attack the validity of the deed in question. After carefully reviewing and weighing the entire evidence we find that the greater weight of the evidence is to the effect that at the time the plaintiff and two of his sisters agreed to a friendly partition of the real estate left them by their father, plaintiff then knew that his deceased mother had made the deed now in question and that he asked and received the most valuable one-third of the property partitioned by his express promise and upon the understanding that he would forego his right to bring a suit to contest the validity of the deed in question.

Appellant insists that his agreement not to contest the validity of the deed was within the Statute of Frauds and could not be made the basis of estoppel. We are unable to agree with this contention. Whether the agreement which appellant made was one falling within the terms of the Statute of Frauds we need not deter-

mine, because unnecessary to a decision of the case. Even though it be considered *arguendo* that it was such a contract—it has been fully performed, the consideration has passed and the respondents are in possession. Under such circumstances equity would refuse to give the plaintiff any relief.

In the case of Rosenberger v. Jones, 118 Mo. 559, l. c. 566, BLACK, P. J., speaking for the court said: "There is no doubt the Statute of Frauds applies to equitable as well as legal estates and as a rule equitable estates can only be assigned by note or memorandum in writing. But as said by Judge BLISS in Grumley v. Webb, 48 Mo. 586, 'One who sells an equitable interest in land, receives the consideration, and yields possession, *will not be permitted* to say afterwards that the assignment was not in writing.' " (Italics ours).

In the early case of Taylor v. Zepp, 14 Mo. 482, one of the leading cases in this State upon the subject of estoppel *in pais* and its relation to the Statute of Frauds, it was held in effect that the Statute of Frauds did not apply to those cases where the doctrine of equitable estoppel or estoppel *in pais* was applicable

Any other view would take from equity one of its strongest prerogatives, e. g., its power to prevent the consummation of those frauds which if not sanctioned by the cold letter of the law are by it not prohibited.

The main object sought to be accomplished by the Statute of Frauds is the prevention of Frauds. One of the very wholesome uses of equitable estoppel is to prevent the Statute of Frauds itself from being used as a fortification behind which fraud may be successfully perpetrated.

While at first blush it might appear that the doctrine of equitable estoppel conflicts with the Statute of Frauds, yet upon closer inspection it clearly appears that the conflict is only a matter of appearance, a mere matter of form and not of substance, and like the mirage of the desert entirely disappears upon closer inspection.

There is no real conflict in substance or principle, but the one might be said to supplement the other—each expending its proper force and energy against the common enemy—fraud.

We are of the opinion that the doctrine of estoppel *in pais* is entirely applicable to the facts of this case and that the learned chancellor was correct in so holding.

Since the above conclusion disposes of the whole case, the discussion of other points mentioned in appellant's brief becomes unnecessary.

The judgment is affirmed. All concur.